[No. 3421.]

JOHN PARKER v. THE STATE.

1. NEW TRIAL — CONTINUANCE. — In a murder case the defendant asked, but was refused, a continuance sought for the purpose of obtaining the testimony of witnesses in support of his theory of self-defense. At the trial he adduced evidence tending to establish that theory, and the testimony of the absent witnesses, as set out in the application, would have materially fortified that evidence. Diligence to obtain the absent testimony being sufficiently shown, and its materiality being obvious, it is *held* that the trial court should have granted a new trial because of its refusal of the continuance.

2. EVIDENCE — DEPOSITIONS. — Under article 772 of the Code of Procedure, a sufficient predicate for the introduction in evidence of a criminal deposition may be made by oath that the witness resides out of the State, or that he has removed beyond the limits of the State, etc. To establish such a predicate, no formal independent oath is necessary, but, like other proof, it may be made by the testimony of a witness. See the predicate laid in the present case, which is *held* insufficient to show that the witness resided out of the State, but sufficient to show that he had removed beyond the limits of the State.

3. SELF-DEFENSE — THREATS — CHARGE OF THE COURT. — Threats made by the defendant to kill the deceased did not deprive the former of his right to defend himself against an attack made on him by the deceased on account of such threats; and where there was evidence calling for such a charge to the jury, the defense was entitled to have it given distinctly and pertinently.

APPEAL from the District Court of Fannin. Tried below before the Hon. D. H. Scott.

Under an indictment charging him with the murder of John Webb, in Fannin county, Texas, on the 14th day of December, 1883, the appellant was convicted of manslaughter, and a term of five years in the penitentiary was assessed against him as punishment.

Moses Warren was the first witness introduced by the State. He identified the defendant in open court, and testified that he knew John Webb in his life-time. Webb was killed in Ladonia, Fannin county, Texas, on the 14th day of December, 1883, by a pistol shot fired by the defendant. The shooting occurred just inside of a circus tent, at the entrance of the same. Witness and deceased were sitting inside of the circus tent, near the inner ring, and some fifteen or twenty steps distant from and north of the tent entrance. Defendant came to where witness and Webb were sitting, and told Webb that he wanted to see him. Webb got up and walked with the defendant towards the entrance of the tent. They left talking in so low a tone that the witness could not understand what they

said to each other.  When they stopped near the entrance of the tent, the witness heard Webb say: " I won't go out of here with you," whereupon the defendant drew his pistol and fired.  Both defendant and Webb then disappeared through or into the entrance or gangway.  Witness saw only the first shot.  When that was fired the defendant's pistol was leveled point blank at Webb's breast. Webb did not, when this first shot was fired by the defendant, have his pistol out.  When this first shot was fired, defendant and Webb were standing about two feet apart, defendant a little in front of and towards the mouth of the entrance.  Webb's back and right shoulder were from the witness.  As soon as the shot was fired witness ran to Webb, who was then coming back through the entrance with his pistol in his hand.  Witness took Webb's pistol from him and asked him if he was shot, and he answered that he was.

Cross-examined, the witness stated that at the time of the shooting some twenty or thirty people were standing about the ring, and several between the witness and the entrance to the tent.  When defendant and deceased went towards the entrance they walked very slowly, Webb with his hands in his pants pockets.  Witness was some ten or fifteen steps distant when he heard Webb decline to go out of the tent with defendant, and noticed that Webb had then withdrawn his hands from his pockets.  The entrance was on the south or southwest side of the tent, and the band was located on the right of the entrance, going in.  The clown was performing at the time that the shooting occurred.  The tent, at the time, was full of people.  Defendant and Webb, just before the first shot, stopped in front of, and at the mouth of, the entrance.  Defendant stood to the left and Webb to the right of the witness.  The witness could see about one and a half feet into the entrance.

Witness remembered seeing Doctor Drake over the body of Webb after he was shot, the body being at that time in the school house, but had no recollection of asking the doctor who killed Webb, and saying: " If I knew I would cut his heart out."  Witness, however, may have asked the question and made the remark.  Witness did not know the defendant prior to the day of the homicide.  Witness denied that, in the presence of B. Merrill and Henry Howard on that day, in the course of a row between Howard and Webb in front of the circus tent, when Webb drew a pistol on Howard, he, witness, said that Webb could shoot if he wanted to.  Witness and Webb were in the circus tent not exceeding five minutes when the shooting occurred.

C. W. T. Weldon was the next witness for the State. He testified that, on the day of the killing, he saw the defendant in the town of Ladonia, at the rear of a house just south of his, witness's, house. He was weeping and cursing, and to witness's question as to what was the matter with him, he replied that Webb had drawn a great long pistol on him, and that he "could whip the whole Webb family." This occurred about an hour or two before the shooting.

Cross-examined, the witness Weldon said that he was well acquainted with the deceased in his life-time. When sober, the deceased was regarded as a quiet, peaceable man, but brave and positive. When drinking he was a dangerous, turbulent man, prompt to resent an insult.

The next witness for the State was Mrs. L. E. Gilliam. She testified that she was acquainted with the defendant and knew the deceased in his life-time. She was in attendance upon the circus and witnessed the difficulty which culminated in the death of John Webb. The witness occupied a seat on the extreme east end of the benches, which was at the northeast side of the amphitheater. Her seat was the second or third from the ground. The entrance was at the southwest side of the tent. She saw the defendant go to the seats occupied by Webb and Warren, and saw defendant and Webb go towards the entrance, walking slowly, Webb with his hands in his pockets. They walked to a point about two-thirds of the way through the entrance, going out, and stopped, defendant about two steps ahead of Webb. Webb still had his hands in his pockets when they stopped, but presently took them out, and the defendant fired. He fired a second time at Webb as the latter was attempting to get his pistol out. Defendant fired a third shot, and Webb turned and walked towards the inside of the tent, leaning forward towards the ground. Witness was of opinion that it was the second shot that took effect, as she saw Webb place his left hand to his breast. His right hand was then hanging down by his side.

Cross-examined, the witness stated that at the time the shooting occurred all of the seats in the tent were occupied, and a large number of people were standing up about the ring. The shooting took place at a point directly opposite the seat occupied by the witness, and to see she had to look across the intervening space. There was considerable noise being made when the shooting occurred, but witness could not remember what was being performed in the ring, or whether or not the band was playing. The seat occupied by Webb before he was approached and called out by defendant was situated

about six feet to the left of the entrance, going in, and was quite near the ring.

G. W. Hendricks testified, for the State, that he was at the circus on the night of the shooting. He saw the defendant go to Webb's seat; saw him and Webb go out together, and shortly afterwards heard the shooting, but saw neither of the parties at that time.

M. M. Taylor testified, for the State, that, a short time before the shooting occurred, he saw the defendant in Ladonia at the court-house, just south of Weldon's business house, and heard him say that he would kill the man who drew a pistol on him. Witness did not hear him mention the name of the man.

Roddy Moore, the next witness, testified, for the State, that, just before the shooting, he met the defendant and Mr. Vaughan going towards town from the circus tent. The defendant appeared to be very angry, and said that he would kill Webb before sundown. Webb and defendant had a difficulty about twelve months before the killing.

M. H. Custer testified, for the State, that Constable Smith handed him a navy size cap and ball pistol, loaded all round. There was a serious defect in this pistol. The hammer would catch on the cylinder, and not strike the cap when let down with the hand. That pistol was not fired off from the time it came into witness's possession until it was fired by one Moore. Witness could see no signs on the cylinder showing where the hammer struck when missing the tubes.

Deputy Sheriff Garrison Moore testified, for the State, that, about five minutes before the shooting, he saw Webb on the outside of the circus tent. If Webb was a deputized officer then, the witness did not know it. About thirty minutes before the shooting occurred the witness saw the defendant and Webb about seventy-five yards west of the circus tent, towards town. Webb was then trying to get his pistol out, and the defendant had his hands in his pockets, as if he, too, was trying to draw a pistol. Witness separated the two parties, and took Webb off towards the tent. The defendant went off towards town with some one else,— the witness thought Mr. Vaughan. Witness was a short distance outside of the tent when the shooting took place, saw the defendant come out, and ordered him to surrender. Defendant answered that he would surrender himself a prisoner to Constable Smith. The defendant was appointed an officer for that day.

George Allard testified, for the State, that he saw the defendant talking to a crowd of men at a point south of Weldon's store-house,

and heard him say that he would "be d—d if he didn't settle with him." Witness did not know to whom the defendant referred.

Bruce Baldwin testified, for the State, that he was at the circus and saw Warren and Webb squatting down by the ring. He saw the defendant go up to them, and then saw defendant and Webb go to the mouth of the entrance. He heard, but saw no part of the shooting.

Cross-examined, the witness said that with Miss Nail and Miss Pendleton he occupied a seat about ten steps to the left of the entrance and about ten or fifteen steps from where Webb and Warren were when defendant stepped up to and went out with Webb. Witness did not see Webb and defendant halt, and they had passed out of his sight when the shooting commenced. Some kind of a performance was going on in the ring, and it was the impression of the witness that the band was playing.

Garrison Moore, recalled for the State, testified that he fired the pistol which he gave Custer, once in the presence of Custer. He discharged but one barrel, and it shot clear. The pistol belonged to John Morris, and was the one that Webb had during the difficulty.

Mrs. Pyles was the next witness for the State. She testified that she was seated at the end of the benches to the south, near the witness Mrs. Gilliam, and could see into the mouth of the entrance. She knew this because, in looking for her husband, she saw him several feet in the entrance and joined him there. Witness heard but did not see the shooting, but thought it occurred in the entrance. It occurred while some kind of performance was going on in the ring.

The opinion sets out the testimony of J. A. Berry, the brother-in-law, and William Sanders, the step-father, of H. M. Young, which testimony was introduced as a predicate for the introduction of the written testimony of the absent witness H. M. Young, taken before the examining trial. Over the objection of the defendant, the State then introduced the written testimony of Young, which is as follows:

"I saw some of the difficulty between John Parker and John Webb. I saw Webb when he fell. I was standing just outside of the entrance to the gangway of the circus tent. While I was standing there Parker passed me and went into the tent. About two minutes after he passed me, I heard a pistol shot, but did not see it. While I was standing there I heard another shot, and I saw Webb fall in the gangway. I had not noticed Webb until I heard the second shot. I noticed a pistol sticking out from Webb's breast

after the second shot was fired. Witness left the entrance and ran some eight or ten steps, and while running heard a third shot fired. After that shot the witness went back and saw the pistol, which he previously saw in Webb's breast, lying on the ground. Shortly before I went to the circus tent, I left my wife at a store in town, and went to look for my brother-in-law. Passing towards the tent in quest of my brother-in-law, I saw the defendant and two other men standing near the northeast corner of the square. Hearing Webb's name mentioned by one of the men,— I did not know which,— I turned and looked at the men, and heard the defendant say that he would " kill the d—d rascal before sunset." A tall man of the party said to defendant: "You had better take care of yourself," and defendant replied that he would do so. I then went on to the circus tent to look for my brother-in-law, and stopped at the outside entrance and witnessed a part of the difficulty as before related. When I heard the threat the three men were standing on the east side of the square, near the northeast corner, near the southwest corner of the house which is just south of the Weldon dry goods store. I was standing just west of them, and about fifteen or twenty feet off."

Cross-examined: "I am certain that Webb fell at the second shot, and that three shots were fired. The two men who were standing with Parker when I heard the threat were of the following description: One was very tall, and wore a gray overcoat; the other was a low, heavy-set young man, wearing a suit of navy blue and a white hat. There were quite a number of people standing about on the outside of the tent, where I stood when the shooting occurred. Lem Wheeler was standing talking to the lady who received tickets in the gangway, rather on the right side going in; the lady standing on the left." The State closed.

W. J. M. Smith was the first witness introduced by the defendant. He testified that he was in the circus tent when the fatal difficulty commenced. He had gone into the outer tent east of the entrance to see a showman who had swindled a negro to the extent of $20. When witness came back he took his stand about six or eight feet in front and a little to the left of the entrance, going in, and could see three or four feet up and into the entrance or gangway. The witness was looking at some performance when the first shot was fired. He looked around immediately and saw Webb with his pistol drawn. Witness ran towards Webb, who was at that time some five or six feet in the entrance from the inside. Witness seized Webb and told him to hold up, but, striking his foot

against a rope, the witness fell to the ground. Webb ran around the witness, saying that he would shoot, or words to that effect. Defendant was backing out of the entrance all of the time. While Webb was running around the witness, the defendant fired two more shots. Webb fell at the third shot, near the outside entrance, where the ticket woman stood. Witness then went out, took defendant's pistol, came back and found defendant's wife fainting. Webb had his pistol in his hand when he fell. The entrance or gangway was about ten or twelve feet long. It faced the south. Two ropes, leading directly northwest, formed the outer entrance to the tent. Thence the canvass formed the other entrance, going directly east some ten or eleven feet.

Cross-examined, the witness testified that he was constable of the beat in which the town of Ladonia was situated. The band was east of the main entrance, and the main seats were on the west side. Witness did not think the seats reached quite half way around. The wagons containing the animals were on the north side. The entrance described was some four or five feet wide. The two ends of the canvas, instead of meeting, stopped short of each other about ten feet, and thus formed the entrance. The witness did not notice how the canvas was placed together at the top. The witness did not see either the defendant or Webb immediately before the shooting. He was then looking at some performance in the ring. Witness could not remember positively whether, after the first shot, Webb said that he would shoot, or that he was not afraid of any d—d man. Witness was not present at the examining trial before 'Squire McClellan. He told County Attorney B. N. Woodson about the case on the streets. He also told the defendant's attorney and B. Merrill. Witness was a cousin to the defendant. He had never before testified in this case, and was never under the rule before this trial.

Quinn Merrill was the next witness for the defense. He testified that he attended the circus and witnessed a part of the fatal difficulty. Webb and a man named Howard had a difficulty. Witness took Howard into the tent, and was watching him to keep him and Webb apart. Witness went with Constable Smith into the outer tent to see about the showman swindling a negro out of $20. On his return he took a seat about fifteen feet north and a little to the left of the inside entrance. After witnessing some performance for a time he looked around for Howard, and missed him. While looking around for him the witness heard the first shot, and, looking in the direction where it was fired, he saw Webb with his pistol drawn

on defendant.  He had his pistol thus drawn throughout the diffi-
culty.  Witness ran into the entrance after the second and third
shots were fired, thinking at the time that the fight was between
Howard and Webb.  Witness did not recognize the defendant until
the shooting was over.

M. H. Hulsey was the next witness for the defense.  He testified
that when the difficulty between the defendant and Webb occurred,
he was inside of the tent, some fifteen or twenty feet northwest of
the entrance.  He saw but little of it.  He, however, saw Webb
draw a pistol from the front of his person.  Defendant and Webb
were then together.  Immediately after Webb drew his pistol, he
and defendant passed beyond the view of the witness, into the en-
trance.  Three shots were then fired in quick succession, which the
witness heard, but did not see.  Witness saw no pistol about the
defendant when Mr. Webb drew his, but the men seemed to have
hold of each other with their left hands.  Defendant's back was
towards the entrance, and Webb was facing him.  The defendant's
right side was from the witness, and witness could not see whether
or not he had a pistol on that side.  Witness did not know whether
Webb drew his pistol from his breast or from his pocket.  He was
in the act of drawing his pistol when he and the defendant disap-
peared into the entrance.

Daniel Orr was the next witness for the defendant.  He testified
that he was present and saw the difficulty in which Webb was killed.
He was standing on the left of the gangway, going in, on the out-
side of the tent, and could see into the interior of the canvas from
where he stood.  Witness saw the defendant when he walked up to
the entrance.  Some one remarked to him: "Go into the show."
Defendant replied that he did not care to go in.  The party replied:
"You are an officer, and it will cost you nothing."  Defendant
then went in.  Witness then saw the defendant walk up to Webb
and say something.  While the two were standing, talking, Webb
drew a pistol, and presented it at defendant's breast.  Defend-
ant then backed towards the outside opening of the entrance,
drawing his pistol and at the same time knocking Webb's up with
his left hand.  Defendant's pistol seemed to hang, and he made
several efforts to get it out before he succeeded.  He was giving
back when he got his pistol out.  When he fired first, his pistol was
pointing over Webb's shoulder.  Webb at that time was advancing
on defendant, and continued to advance until defendant fired the
third shot, when he sank down at the outer edge of the entrance.
From the time that he drew his pistol until he fell, Webb continued
to make movements with his hand, as if trying to shoot.

Cross-examined, the witness testified that, prior to the difficulty, defendant told him that Webb had drawn a pistol on him for nothing; that he went to Webb to arbitrate a difficulty that had occurred between Webb and Howard, when Webb drew a pistol on him. Witness thought that Tom Wheeler was the party who told defendant to go into the circus. About the time that the third shot was fired, the witness saw Constable Smith in the entrance, but did not see him seize Webb. Smith may have done so. Witness was standing at the time among two or three others, including his brother, John Orr, who stood behind him, and witness tried to see all that was to be seen. If witness stated on the examining trial that defendant fired his third shot over his left arm, he was mistaken. It was the second shot that defendant fired over his left arm.

J. W. Partain was the next witness for the defense. He testified that when the fatal difficulty occurred, a part of which he saw, he was sitting on horseback, about ten or twelve feet southwest of the entrance, between the entrance and the ticket office. He saw the defendant go in at the rope gangway, turn to the main entrance, and stop. Witness then saw a hand reach from behind the canvas and grasp defendant's shoulder. Witness then saw defendant retreating backwards before the advance of some one, and next saw a pistol in some one's hand, pointed directly at the defendant. The defendant had his right hand down by his side, and seemed to be trying to get a pistol out of his pocket. About this time the first shot was fired. Witness then saw the defendant raise his hand, and heard another shot, but the report did not sound like the first one. Defendant then stepped back, raised his arm, and fired again. When the last shot was fired, Webb came in view of the witness, with his pistol in his hand. The defendant was backing throughout the difficulty. He fired the last shot from a point about midway in the entrance. Webb, after the last shot, advanced until he reached the outside edge of the entrance, when some one ran against him, and he fell.

Cross-examined, the witness testified that while these events were transpiring, he was sitting on his horse outside the tent waiting for a friend who had gone up town after a bucket. Several persons were standing about the outside entrance, but witness had no recollection of seeing Dave Orr at that place. Constable Smith did not seize Webb when the first shot was fired. Witness had no recollection of seeing Smith. No one caught hold of Webb until after the last shot was fired. The second shot was fired by the defendant "straight out from the body." Webb did not move an inch from

the inside entrance of the tent from the time the first shot was fired until after the last one was fired.

W. B. Merrill, the defendant's uncle, testified in his behalf that, about one hour before the fatal difficulty, Webb and Howard had a difficulty on the outside of the circus tent. They cursed, abused and denounced each other, when the witness interposed to settle the dispute. Witness was an appointed officer for that day. During that difficulty Webb drew his pistol on Howard, and Howard made an effort to draw his. Witness took Webb's pistol away from him, and pushed it down his bosom, when he, Webb, swore he would shoot. Defendant came up about this time and told Webb that Howard was a friend of his, and advised Webb to apologize to Howard for drawing a pistol on him. Webb replied to defendant that perhaps he wanted to take the matter up, and drew his pistol on defendant, swearing that he would shoot. About this time Mose Warren and some one else came up, and Warren remarked that if Webb wanted to shoot he could do so. Witness then remarked that both parties were drunk, and that if they did not get quiet he would jail them. After this the witness went into the circus, taking his position on the north side, the ground on that side being lower than on the south. He heard the shooting, but saw no part of it.

Custer had charge of Webb's pistol about one week. Witness, Custer and Brown Johnson examined this pistol and found it defective. The cylinder would not turn far enough for the hammer to strike the cap, and in letting the hammer down it had to be adjusted with the hands.

Cross-examined, the witness stated that he did not shoot or attempt to shoot off Webb's pistol, but examined it by working it with his hands. He (Webb or witness?) got the pistol that morning from a man from Delta county. There were some fifty or seventy-five drunken men about the circus grounds on the day of the shooting, and people generally were expecting a difficulty between the wire fence cutters and the pasture men, and when the witness heard the shooting he thought that the fight had commenced. People were going in and out of the tent all of the time. Defendant was on duty as an officer appointed for that day. He was at the witness's house on that day, and he and his wife left witness's house together to go to the circus. Witness knew as a fact that the pistol committed to Custer's care was the pistol Webb had during the difficulty. Webb was a very dangerous man when drinking, and had been under the influence of whisky two-thirds of the

time for two years.   He, Webb, was drunk on the day of the kill-
ing.   Mose Warren was drinking on that day.   Webb and defendant
had been on perfectly friendly terms until the day of the fatal dif-
ficulty.   Witness (who never drank liquor) and the defendant were
both perfectly sober when the difficulty occurred.   Webb had
clerked for the defendant in the defendant's store, and, when a child
of the defendant died some time previous to the difficulty, he at-
tended to its burial.

G. A. Vaughan testified, for the defense, that he was present at
the first difficulty between the defendant and Webb, which took
place about seventy-five yards from the tent, towards town.   He
saw Webb draw a pistol on the defendant.   Witness took defendant
and went towards town with him.   Some one else took Webb
towards the tent.   Defendant was very angry as he went to town,
and talked a great deal about Webb.   Witness took the defendant
to the house south of Weldon's store and, in the course of a talk
with him, persuaded him to drop the matter, which he agreed to
do.   Witness then left defendant and went to the circus, where he
saw Webb, and told him that defendant wanted to drop the quar-
rel, and advised Webb to do the same thing.   Webb agreed to do
so, but said that he " would not be dogged by them any more."
Witness then took his children off to see the animals.   When he
returned to the mouth of the entrance to the tent, he saw Webb
standing in the tent about two steps from the mouth of the en-
trance. ˙ Witness walked out of the tent, and just as he got outside
he heard the shooting.   Witness heard defendant, at the time of the
first difficulty described, say to Webb that if he, Webb, would throw
down his pistol, he, defendant, could whip him.

Frank Ottinger was the next witness for the defense.   He testi-
fied that he saw the first difficulty between Webb and the defend-
ant, described by the witness Vaughan.   He saw Webb draw his
pistol on the defendant, and heard defendant tell Webb that How-
ard was drunk and liable to hurt him.   Webb replied that he would
kill both the defendant and Howard.   Deputy Sheriff Garrison
Moore then threw the defendant around and took Webb off.   De-
fendant left in company with an old man.

J. H. Cummings testified, for the defense, that while he was
standing to the left of the tent entrance, going in, Vaughan called
him to the mouth of the entrance, and, as they went in together
and returned, they met Webb, who said something as he passed
which witness did not understand.  Witness did not see the defend-
ant at all.   In a moment he heard the shooting, and saw Webb,

with a pistol, come back to the mouth of the entrance, where he fell. Witness did not know whether Webb went out or not, but he went towards the outside of the tent.

W. B. Clements testified, for the defense, that Webb, when drinking, was considered a very dangerous man, and as one who would execute a threat. Witness and Webb once had a difficulty.

Tom Burden testified, for the defense, that, when the first shot was fired, he was standing by the south wall, ten or twelve steps east of the mouth of the entrance, looking at the performance. He looked and saw Webb with his pistol drawn on the defendant. Webb drew his pistol two or three times, when the defendant fired two more shots. Webb then fell at the west end of the entrance, got up, and, with his cocked pistol in his hand, staggered back into the tent. Two or three men ran into the entrance when the shooting commenced. Bruce Baldwin was drunk.

The questions discussed in the opinion were among those raised by the motion for new trial.

*Taylor & Galloway*, for the appellant. The first assignment of errors relates to the action of the court in overruling defendant's application for continuance. The court having discretionary power in its action on applications for continuance, appellant will present it in connection with his motion for a new trial.

We submit that the evidence of M. J. Pennington and John Orr was material and probably true, when taken in connection with the other testimony.

The theory of the State is that defendant came into the tent, enticed deceased to the gangway, and shot him down without cause or excuse, and on express malice. The defendant claims that he was acting in self-defense and therefore justified.

The testimony of David Orr was, substantially, that he was standing on the outside of the circus tent, in front of the main entrance to the tent, and could see up the entrance into the main part of the circus; that defendant was going into the tent and met deceased, when deceased drew his pistol, and defendant then drew his, after which the shooting commenced. This witness says that his brother, John Orr, was with him at the time.

The absent witness, John Orr, would have sworn that he was in position to see the difficulty and did see it, and that deceased made the first attack on defendant, and defendant shot in defense of himself.

The testimony of M. J. Pennington, we submit, is of great im-

portance in connection with the other testimony in this case. She would have sworn that the deceased came back into the tent after he was shot; she heard him say that he "had played the devil and was a dead man."

On account of the conflict in the testimony of the State's and defendant's witnesses, the defendant would have been materially benefited by this declaration of the deceased at the very moment of the shooting. It certainly is a declaration showing that he was to blame, the use of such words as "that he had played the devil." The jury were in doubt about the matter, as shown by their verdict of manslaughter; for the court will see that if the two main witnesses for the State were believed, it could not have been less than murder in the second degree. It is probably true; for it was shown by witness Moses Warren that the deceased told who shot him. The testimony of Bruce Baldwin is that M. J. Pennington was in the tent at the time. It also coincides with the testimony of defendant's witnesses, that the killing was done in self-defense. (Clark's Criminal Law, art. 1380; 8 Texas Ct. App., 493.)

We admit that the evidence of the two witnesses to the declarations of H. M. Young that he was going to Tennessee at the time he left, was competent testimony to show the intent of the witness, but not to show that he resided in another State or out of this State. In this case, however, they proposed to show that the witness resided in Tennessee by showing letters written by the wife of the witness; not even the declaration of the wife, but the mere fact that they received a letter from her postmarked Tennessee. Neither one knew the contents of the letters. For aught that appears, the letters might have shown that they were moving back or were not located. Now we submit that the wife who wrote the letters would have been a competent witness to show, if she knew, the real fact of his residence.

In order that a declaration be admitted it must be by the party affected and not by any one else. Now in this case the State has never shown but one declaration of the witness, and that was that he was going to Tennessee; no declaration after he reached there, no evidence that he was ever in the State, and nothing from him in any way except a bare mention of his name in a letter written by another party; the letter not even stating whether he was in Tennessee or Texas, or whether he was dead or alive. Certainly this character of hearsay is not admissible against a party tried for felony.

We therefore submit that the testimony is hearsay and not ad-

missible, and if admissible that it fails to show that the witness resided out of the State. If we are correct in this, the testimony of H. M. Young was inadmissible and the judgment should be reversed. (*Post* v. *The State*, 10 Texas Ct. App., 480; *Evans* v. *The State*, 12 Texas Ct. App., 370; 1 Wharton's Evidence, sec. 178; Id., sec. 482; 2 Wharton's Evidence, sec. 1099; *Pinkney* v. *The State*, 12 Texas Ct. App., 352.)

The second paragraph of the refused charge is as follows: If the deceased Webb, on account of threats made by the defendant against him, attacked the defendant with a pistol or in such manner as was calculated to induce the defendant Parker to believe his life was in danger, these former threats made by defendant, if any were made by him, would not operate to deprive the defendant of his right of self-defense, but the defendant would have the right to act as though he (defendant) had made no threats.

We submit that this charge was correct and should have been given. It is true the court charged on the right of self-defense, and did not charge on threats, only in a general way in his charge on express malice. The court did charge on mutual combat, and to the effect that if defendant went to Webb armed with a deadly weapon, and by his acts and words brought on the difficulty, then the defendant would not be justifiable. In connection with this charge we think it would have been proper for the court to have charged the jury as requested, so that if the jury did believe the deceased commenced the attack, then they need not infer that defendant brought on the attack on account of the threats made by defendant.

Threats were proven against deceased by Rody Moore, C. W. T. Weldon and others. There was no evidence showing that these threats were ever communicated to deceased. The record is silent on this point.

The sixth assignment of error is as follows: The court erred in its charge, sections Nos. 9 and 10, on the subject of mutual combat and self-defense. Section 9 of the charge is as follows, to wit: "If you find from the evidence in this case that defendant shot and killed John Webb, but that such killing took place in self-defense, as hereinafter explained, then you will find the defendant not guilty; but, in this connection, I charge you that, if defendant willingly entered into a fight with the deceased John Webb, with deadly weapons, or if defendant incited or brought on such fight, at the same time intending to kill or do some serious bodily injury to said Webb, then defendant cannot claim the benefit of self-defense, and

this would be so even if, during the conflict, defendant's life was put in peril."

The tenth section is as follows: "If defendant and John Webb had a difficulty during the day of the killing, and if defendant went to said Webb in a peaceable manner to try and amicably settle such difficulty, and if said Webb, upon being thus approached, drew or attempted to draw a pistol on defendant in such manner as reasonably indicated an intention on his, the said Webb's, part of killing defendant or doing him some serious bodily injury, then defendant had a right to kill him, and such killing would be in self-defense. If, however, defendant approached John Webb in a hostile or unfriendly manner, intending thereby to bring on a deadly conflict, and in such conflict defendant intentionally killed said Webb, such killing would not be in self-defense."

The first portion of section 9 of the charge is correct, and should have been given without the qualification to it in the balance of said section. There was no testimony from which the jury could have inferred that the parties willingly entered into a difficulty with deadly weapons. On the contrary, if the testimony of the State's main witnesses is taken as true, then the killing was done by defendant without cause, and was murder. If the statements by defendant's witnesses are true, then the killing was in self-defense. In neither the testimonies of the State or defendant's is there any testimony or any circumstance tending to show a mutual combat with deadly weapons.

The tenth section of said ·charge at first view seems to benefit defendant, yet we think it is injurious in this respect: that it conveys to the jury the idea that, in order for defendant to be justifiable in going in to see Webb and afterwards killing him, he must have gone to him for the purpose of settling the former difficulty had between the parties.

Now there was no testimony that he went for that purpose or for any other purpose, and we think that the court should have charged that if defendant went to deceased in a peaceable manner and made no demonstrations or used no words for the purpose of bringing on the difficulty, he would be justifiable.

The latter part of said section also helps to destroy the charge on self-defense by charging the jury that if defendant approached deceased in a hostile or unfriendly manner, intending thereby to bring on a deadly conflict, and in such conflict killed, etc. All the State witnesses swore that defendant approached deceased in a quiet manner. They walked to the mouth of the tent quietly, with their

hands in their pockets, and walked slowly; no hostile demonstrations whatever. We think this portion of the charge calculated to impress the jury with the idea that defendant went into the tent for the purpose of raising a difficulty, and, in effect, impresses the jury that the defendant was not justified in any event. And again, these sections, in connection with the main charge, ignore the theory of the defendant that he met deceased in the gangway and was attacked by deceased and shot in self-defense, and assume the fact that defendant went to deceased in the tent, thereby impressing the jury with the idea that he did go into the tent, and at the same time impressing the jury with the idea that the evidence of the State was true. We think the court would have had the right to charge on this view of the case, yet, in connection with it, should have charged on defendant's theory.

We think the charge gives undue prominence to this portion of the case. We make the following propositions in connection with the above statement: When the court directs the attention of the jury to the facts, it should refer to all the facts bearing upon all issues, so as to present the case fairly for both parties. (Sacket, Instruction to Juries, pp. 15 and 16, sec. 10; citing *Cushman* v. *Cogswell*, 86 Ill., 62; *Snyder* v. *The State*, 59 Ind., 105.)

An instruction which singles out and gives undue prominence to certain facts, ignoring the facts proven and of equal importance in a proper determination of the case, is improper. (Sacket, Instruction to Juries, p. 16, sec. 11; citing *Jones* v. *Jones*, 57 Mo., 138; *Calif* v. *Thompson*, 81 Ill., 478.)

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. Defendant's application for continuance, in so far as it related to the absent witnesses M. J. Pennington and John Orr, is in strict compliance with the requirements of the statute (Code Crim. Proc., art. 560), and, whilst it is not so averred as to the others, it is expressly stated that as to these witnesses "there is no reasonable expectation that the attendance of said witnesses can be secured during the present term of the court by a postponement of the trial to some future day of said term." As to the witness M. J. Pennington, the application went beyond the requisites of a first application and stated that her testimony could not be procured from any other source known to affiant, and that he had reasonable expectation of procuring the same at the next term of court. (Code Crim. Proc., art. 561; *Pinckord* v. *The State*, 13 Texas

Ct. App., 468.) Diligence to secure the attendance of these witnesses is also shown. Let us see as to the materiality of their proposed testimony, and the probability of its truth, considered in connection with the evidence adduced on the trial, as the same should have been considered by the trial judge when passing upon appellant's motion for a new trial in the lower court.

Two different theories are contended for by the parties. On behalf of the State the evidence showed a killing without cause or excuse,— an assassination, in fact. On the other hand, defendant claimed, and the testimony of several of his witnesses tended to show, that he took the life of the deceased in self-defense. Now, in addition to the testimony of these witnesses, he swears that he expects to prove by the absent witness John Orr "that he (the witness) was present at the killing and within a few steps of the parties at the time of the killing, and saw the deceased draw his pistol and attempt to shoot defendant before defendant drew his pistol or fired it." This statement, if deposed to by the witness at the trial, would have coincided, in a great measure, with that of several of defendant's witnesses, and particularly with the testimony of David Orr, who was a brother of the absent witness, and who was with him at the time the shooting took place. Whilst the testimony proposed to be adduced from the witness M. J. Pennington is not so direct and pertinent as the above, yet it cannot be said, taking all the other evidence into consideration, that it could not have had its effect in assisting the jury in coming to their conclusion as between the two theories submitted to them. We are of opinion that the court should have granted defendant a new trial, when this testimony is considered in connection with the evidence which had been elicited at the trial.

With a view to a second trial of this case we will now notice some of the other questions raised, and which might likely be presented on such other trial. A short time after the homicide defendant was arrested and brought before a justice sitting as an examining court. At this examining court one H. M. Young appeared and testified as a witness in behalf of the State, and his testimony was reduced to writing by the justice holding the court. On the trial, from which this appeal was taken, the witness H. M. Young, not being present in person, the prosecution proposed to read in evidence his written testimony taken before the examining court, and defendant objected to the same upon the ground that a sufficient predicate was not laid by the State for the introduction of such testimony.

Our statute provides the rules which govern the introduction of

such testimony. And two of these rules are, first, that the witness resides out of the State, or, thirdly, that he has removed beyond the limits of the State. (Code Crim. Proc., art. 772; *Evans* v. *The State*, 12 Texas Ct. App., 370.) Where either of these grounds is relied upon, oath must be made of the fact that the witness resides out of the State, or that he has removed beyond the limits of the State. No formal independent oath is necessary, provided the fact is established, as any other fact may be, by the testimony of some witness. (*Post* v. *The State*, 10 Texas Ct. App., 579; *Pinkney* v. *The State*, 12 Texas Ct. App., 352.)

As a predicate in this case for the introduction of the absent witness Young's testimony, the State introduced J. A. Berry, a brother-in-law of the witness Young, who swore that H. M. Young and family left here to go to Tennessee; that this witness got a letter from H. M. Young's wife, some time ago, postmarked Tennessee; and by Wm. Sanders, the step-father of H. M. Young, that H. M. Young left Bonham in December, 1884, and stated that he was going to Smith county, Tennessee; that he did not know whether he would stay or not; that he said he would come back if he didn't like the country; that his, witness's, wife received a letter from H. M. Young's wife some time ago; that he did not know the contents of the letter; that the letter spoke of H. M. Young. It was objected that the testimony of these witnesses was hearsay; that the letters spoken of by them were not letters written by H. M. Young, and, if the letters even mentioned H. M. Young, that, being written by a third party, they were mere hearsay as to Young; and that, whilst it was competent to show the declarations of Young that he was going to Tennessee at the time he left, such declarations would not be sufficient to show that he had in fact gone to Tennessee and that he resided there.

It has been held that a witness's statement, even in a deposition itself, that he is about to go abroad, will not render it unnecessary to prove that he has put his purpose into execution. (1 Whart. Ev., 2d ed., § 178.) Mr. Bouvier says "that legal residence, inhabitancy and domicile are generally used as synonymous. . . . Two things must concur to establish domicile — the fact of residence, and the intention of remaining. . . . These two must exist, or must have existed in combination. . . . Nor is the intention of constituting domicile alone, unless accompanied by some acts in furtherance of such intention, sufficient. . . . Removal to a place with the intention of remaining there for an indefinite period, and as a place of fixed present domicile, constitutes domicile, though

there be a floating intention to return. . . . Both inhabitancy and intention are, to a great extent, matters of fact, and may be gathered from slight indications. . . . Declarations made at the time of a change of residence are evidence of a permanent change of domicile; but a person cannot by his own declarations make out a case for himself. . . . The domicile of the husband is that of the wife." (1st Bouvier's Law Dictionary, Title "Domicile.") Mr. Webster defines *to reside* to mean "to remain; to dwell permanently or for a length of time; to have a settled abode for a time."

Now whilst, under the above authorities, perhaps, it cannot be said that the predicate adduced was sufficient to establish the fact that the witness Young resided out of the State of Texas or in the State of Tennessee, yet we think that the evidence was sufficient as a predicate to show that he had removed beyond the limits of the State. That he has removed beyond the limits of the State is as much a ground for the introduction of the written testimony of a witness taken at an examining trial as is the fact that the witness resides out of the State. (Code Crim. Proc., art. 772, subdiv. 3.) To remove is, according to Mr. Webster, "to change place in any manner; or to make a change in place; to move or go from one place to another."

In the case we are considering the fact that the witness Young left the residence of his step-father to remove to Tennessee, and the fact that he had not returned, coupled with the further fact that he had stated, at the time he left, that he would return if he didn't like it, and the fact that the witness's wife had written to Berry from Tennessee, we think sufficiently establish the fact that the witness Young had removed beyond the limits of this State, whether he had acquired a residence or domicile in Tennessee or not. (*Garcia* v. *The State*, 12 Texas Ct. App., 335; *Cowell* v. *The State*, 16 Texas Ct. App., 57.)

The court did not err in holding that a proper predicate had been laid for the introduction of the written testimony of the absent witness H..M. Young.

Two special instructions were requested in behalf of the defendant, and were refused by the court because they were stated to be fully embraced in the general charge. We do not think the general charge embraced the second special instruction, and, under the charge as given and the peculiar facts of the case, we believe this instruction should have been given in connection with the general charge. This instruction is in these words, to wit: "That, if the

deceased Webb, on account of threats made by the defendant against him, attacked the defendant with a pistol, or in such manner as was calculated to induce the defendant Parker to believe his life was in danger, these former threats made by the defendant, if any were made by him, would not operate to deprive the defendant of his right of self-defense; but defendant would have the right to act as though he, defendant, had made no such threats." This special instruction is the law, and was pertinent and applicable to one phase of this case shown by defendant's witnesses. (*Smith* v. *The State*, 15 Texas Ct. App., 338.) The refusal to give the special requested instruction might not have been such material error as would have been reversible, in view of the charge as given; still, inasmuch as it was the law and presented this phase of the case, or rather the law upon it, in a more pointed and pertinent manner than it was presented in the general charge, we are of opinion that defendant was entitled to it, and that it should have been given.

The other errors assigned and discussed by counsel in the brief for appellant are not noticed or commented on by us, because they are not likely to arise upon another trial.

Because the court erred in overruling defendant's motion for a new trial, for the reasons indicated in the first portions of this opinion, the judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered April 25, 1885.]